# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# DALLAS DIVISION

| | | |
|---|---|---|
| IN RE THE APPLICATION OF, | § | |
| | § | |
| EVER NAHUM MENDIETA CHIRINOS, | § | |
| | § | |
| Petitioner, | § | |
| | § | Civil Action No. 3:18-cv-02668-M |
| v. | § | |
| | § | |
| YURIS ONEYDA ORTEZ UMANZOR, | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM OPINION AND ORDER

In this action, Petitioner Ever Nahum Mendieta Chirinos seeks the return of his two children, Y.A. and I.N., to the country of Honduras under the 1980 Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention") and the International Child Abduction Remedies Act, 22 U.S.C. § 9001 *et. seq.* ("ICARA"). The Court held a two-day bench trial on the merits of Petitioner's Verified Petition [ECF No. 1], beginning on April 29, 2019. For the following reasons, the Court **GRANTS** the Verified Petition and **ORDERS** that Y.A. and I.N. be returned to Honduras.

### I. Background

Petitioner is a resident of the Republic of Honduras and currently resides there. Respondent and the children, Y.A. and I.N., initially resided in Honduras, but immigrated to the United States in late 2017. Respondent and the children currently reside in Irving, Texas. There is no evidence that Respondent and the children sought legal status prior to entering the United States, or that they have sought or attained legal status in the time since they arrived here.

### a. Stipulated Facts

The parties stipulate to the general facts that underlie this action. The parties agree that Petitioner is the father of Y.A. and I.N. and that Respondent is the children's mother. [ECF No. 63 at 2]. Y.A. was born on March 29, 2012, and I.N. was born on October 8, 2015. [*Id*.]. Both children were born in Honduras and lived there until November 2017. [*Id*.].

In November 2017, Respondent and the children left Honduras and entered the United States in December 2017. [*Id*.]. Petitioner did not give consent, written or otherwise, to Respondent's removal of the children from Honduras. [*Id*.]. No court, in Honduras or elsewhere, has granted Respondent full custody of the children or has stripped Petitioner of his custody rights. [*Id*.].

Respondent and the children remain in the United States. [*Id*.]. Petitioner commenced this action on October 9, 2018, seeking the return of the children to Honduras. [*Id*.].

### b. Trial Testimony

Petitioner and Respondent met at a dance in Honduras in 2006 and began a relationship. The two were romantically involved until Petitioner illegally immigrated to the United States later that year. Petitioner remained in the United States until he was deported in 2010. After his deportation, Petitioner returned to Honduras and the romantic relationship between Petitioner and Respondent resumed. Respondent became pregnant with the couple's daughter, Y.A., in 2011. After Respondent learned that she was pregnant, Petitioner and Respondent began living together at the home of Petitioner's mother. Y.A. was born on March 29, 2012, and lived with Petitioner and Respondent at the home of Petitioner's mother until at least April 2015.

At some time after Y.A. was born, Petitioner had a relationship with a woman other than Respondent. This relationship produced a son, E.S., who was born on July 29, 2014. Petitioner

never lived with E.S. or his mother, and he does not keep in contact with E.S. E.S. and his mother, with Petitioner's consent, moved to the United States when E.S. was about two years old. Petitioner testified that he never lived with E.S. or his mother.

At this point, the parties' and witnesses' versions of events diverge significantly. Respondent testified that while she was pregnant with I.N., in April 2015, she became aware that Petitioner had been involved with another woman and that the woman was pregnant. Respondent alleges that she confronted Petitioner about this and that he shoved her. Respondent alleges that she then took the children and moved to the home of her maternal grandparents. Respondent testified that neither she nor the children ever lived with Petitioner after April 2015. Respondent also initially testified that the children never spent the night with Petitioner after she moved out in April 2015, but Respondent later recounted a time when Petitioner allegedly took Y.A. from the front yard of her grandparent's home and only later returned Y.A. to Respondent reluctantly. Respondent acknowledged that Y.A. did spend the night with Petitioner during this time.

Respondent testified that Petitioner only saw the children two or three times after she moved out in April 2015: once from afar in public, once at a political rally, and once when he took Y.A. from Respondent's grandparents' home. Respondent testified that Petitioner represented a physical danger to the children because "he's a drunk" and "gets high." Respondent testified that she found bags of cocaine in Petitioner's pocket three times. Respondent admitted, however, that she has no evidence—beyond her own testimony—that Petitioner had a history of drinking, drug use, or of abusing her physically.

In her testimony, Respondent alleged that Petitioner never gave her money to support the children, but she did acknowledge at trial that Petitioner's mother provided money for the children,

at times. Respondent admitted that she never spoke to Petitioner about terminating Petitioner's custodial rights over the children.

Petitioner told a very different story. Petitioner acknowledged that Respondent did move out of his mother's home for a time while she was pregnant with I.N. However, according to Petitioner, Respondent remained away for only two or three days, after which she returned to live at his mother's home. Petitioner testified that Respondent continued living with him at his mother's home until mid-to-late 2016, when I.N. was about one year old. It was not until this time, Petitioner alleges, that Respondent and the children began living away from Petitioner at the home of Respondent's grandparents. This testimony conflicted with Petitioner's earlier verified statement that Respondent and the children moved out of his mother's home in August 2017. [ECF No. 1 at 4].

Petitioner testified that, after Respondent and the children moved, he visited the children at Respondent's grandparents' house almost every day after work. Petitioner also testified that, after they moved out, Respondent and the children visited him at his mother's house. Petitioner claimed that he played with the children, brought them toys and juices, and took them for rides on his motorcycle. Petitioner also testified that he provided money to Respondent for the support of the children while she was at her maternal grandparents' house.

I.N. was born with a cleft palate, which caused the child to have difficulty swallowing. Petitioner testified that, through a friend, he became aware of an international charity known as Operation Smile, which provided free treatment for children with cleft palates. Respondent testified that she, not Petitioner, learned of Operation Smile and contacted them seeking treatment for I.N. I.N. had a surgery provided by Operation Smile on or about April 23, 2017. After the operation, I.N. needed special milk which cost 600 to 800 Honduran Lempiras. Petitioner testified

that he often bought the milk for I.N., or provided money to Respondent to buy it. Respondent testified that Petitioner never provided any such funds.

Petitioner testified that, on November 27, 2017, he borrowed a bicycle and went to see the children at Respondent's grandparents' home. Upon arriving, Petitioner allegedly heard Respondent speaking to a "coyote" with whom Respondent planned to travel to the United States. Petitioner testified that, after hearing this, he told Respondent the he did not want the children going to the United States. Petitioner testified that he returned the next day and found that Respondent and the children were gone.

Petitioner then sought legal help to secure return of the children. He first went to the local court, but was told to wait 72 hours before initiating a lawsuit. Petitioner then traveled to the El Salvador-Honduras border in hopes of intercepting Respondent and the children. After this was unsuccessful, Petitioner sought help with various authorities in Tegucigalpa before he was put in touch with the United States Department of State and later filed this lawsuit. Petitioner estimates that he has spent about $1,500 pursuing the return of the children.

### c. Petitioner's Supporting Witnesses

Three witnesses testified in support of Petitioner. Angel Gabriel Ortiz Dominguez, a neighbor of Petitioner when Petitioner lived at his mother's home, has known Petitioner for 25 years. Ortiz testified that Respondent moved out of Petitioner's mother's home about five months before she left for the United States in November 2017. Ortiz also testified that, after Respondent and the children moved, he visited Respondent's grandparents' house with Petitioner three times so that Petitioner could see the children. Ortiz also testified that he saw Petitioner with the children once in town at a medical clinic after they began living with Respondent's grandparents. Ortiz testified that, in his opinion, Petitioner was a good father.

Rolmann Ezequiel Avila Turcios also testified in support of Petitioner. Avila lives two houses away from Petitioner's mother's home. Avila testified that he was in the presence of Petitioner and the children many times. Avila testified that, after Respondent moved to her grandparents' house, he visited the grandparents' house with Petitioner several times. Avila testified that he saw Petitioner playing with the children at the grandparents' house and that Petitioner would remain there for two to three hours. Avila also testified that he saw Petitioner give Respondent money for the children. Avila stated that Petitioner was a good father and that he did not believe that Petitioner was the type of person who would harm his children.

Finally, Kelyn Sujey Euceda Ordonez, the girlfriend of Petitioner, provided testimony. Euceda has known Petitioner for eight years total, and the two have been in a relationship for over one year. Petitioner and Euceda currently live together. Euceda testified that Respondent moved out of Petitioner's mother's home in June 2017. Euceda also testified that she saw Petitioner with the children on his motorcycle when I.N. was about six months old.

### d. Respondent's Supporting Witness

One witness, Marianna Dominguez, testified in support of Respondent. Dominguez is currently Respondent's neighbor in the United States, and lives with Respondent's uncle. Before she moved to the United States in 2016, Dominguez lived near Respondent's grandparents' house in Honduras. Dominguez testified that Respondent moved to her grandparents' home in April 2015. Dominguez testified that she never saw Petitioner visit the children at Respondent's grandparents' house. Dominguez also testified that Petitioner was not present at the hospital when I.N. was born.

## II. Legal Standard

The Hague Convention "seeks 'to secure the prompt return of children wrongfully removed to or retained in any Contracting State,' and 'to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States.'" *Abbott v. Abbott*, 560 U.S. 1, 8 (2010). The Convention's central operating feature is the return remedy. *Id*. at 9. When a child under the age of 16 has been wrongly removed or retained, the country to which the child has been brought must "order the return of the child forthwith." *Id*. A removal is "wrongful" where the child was removed in violation of "rights of custody" under the law of the state in which the child was habitually resident immediately before the removal. *Id*. at 8, 9. The Convention defines "rights of custody" to include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence. *Id*. at 9. Return of the child does not alter the preabduction allocation of custody rights but, instead, leaves such decisions to the courts of the country of habitual residence. *Id*.

The United States has implemented the Convention through ICARA. *Lozano v. Montoya Alvarez*, 572 U.S. 1, 5 (2014). This statute allows a person who seeks a child's return to file a petition in state or federal court, and it instructs that the court "shall decide the case in accordance with the Convention." *Id*.

## III. Analysis

For the reasons that follow, the Court finds that Petitioner has established a *prima facie* case for return under the Hague Convention and that Respondent has not shown that any defense to return applies. Therefore, the Court orders the return of Y.A. and I.N. to Honduras.

### a. Petitioner's *Prima Facie* Case

To establish a case for return under the Hague Convention, a petitioner must show that:

1. "the respondent removed or retained the child somewhere other than the child's habitual residence";

2. "the removal or retention violated the petitioner's 'rights of custody' under the habitual-residence nation's laws"; and

3. "at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been exercised but for the removal or retention."

*Larbie v. Larbie*, 690 F.3d 295, 307 (5th Cir. 2012). A petitioner must prove each of these elements by a preponderance of the evidence. *Id*.

### i. Removal from Habitual Residence

The Court must first determine whether Respondent removed the children from the country of their habitual residence. The term "habitual residence" is not defined in the Hague Convention. *Id*. at 310. To determine a child's habitual residence, the Fifth Circuit has "adopted an approach that begins with the parents' shared intent or settled purpose regarding their child's residence." *Id*. "The threshold test is whether both parents intended for the child to 'abandon the habitual residence left behind.'" *Id*. at 310–11 (quoting *Mozes v. Mozes*, 239 F.3d 1067, 1075 (9th Cir. 2002)). "Absent shared intent, [the] 'prior habitual residence should be deemed supplanted only where the objective facts point unequivocally to this conclusion.'" *Id*. at 311 (quoting *Mozes*, 239 F.3d at 1082)). The "parents' intentions should be dispositive where . . . the child is so young that 'he or she cannot possibly decide the issue of residency.'" *Id*. at 310 (quoting *Whiting v. Krassner*, 391 F.3d 540, 548–49 (3d Cir. 2004)).

Here, the parties stipulate that, prior to November 2017, neither child resided in any country other than Honduras. [ECF No. 63 at 2]. The parties also agree that Petitioner never gave consent or otherwise acquiesced to the removal of the children from Honduras. [*Id*.]. The testimony at

trial was consistent with these stipulations. The facts here establish that the last location of shared intent for the children's residence was Honduras. It is also not in dispute that Respondent removed the children from Honduras in November 2017 and that she has retained them in the United States ever since. [*Id.*]. The Court finds that Petitioner has established that Honduras was the habitual residence of the children prior to their removal and that Respondent has removed and retained the children in a country other than Honduras.

### ii. Violation of Rights of Custody

Next, the Court considers whether the removal and retention were in violation of Petitioner's rights of custody. *Larbie*, 690 F.3d at 307. "When no formal custody agreement exists between the parents, courts must apply the laws of the country of the child's habitual residence to determine if the non-removing parent had rights within the meaning of the Convention." *Sierra v. Tapasco*, No. 4:15-cv-00640, 2016 WL 540933, at *7 (S.D. Tex. Sept. 28, 2016), *aff'd*, 694 Fed. App'x 957 (5th Cir. 2017). The parties agree that no Honduran court has entered an order granting Respondent full custody of the children, [ECF No. 63 at 2], and there is no evidence that any other formal custody agreement between the parties exists.

Therefore, the Court looks to the custody rights provided by Honduran law. Article 187 of the Honduran Family Code provides that "parental authority belongs to both parents jointly." [ECF No. 54 at App.6 (translating Honduran Family Code, Art. 187)].[1] "Parents in the exercise of parental authority have the right to exercise guidance, care and correction of their children, and

---

[1] "Article 14 of the [Hague] Convention authorizes the [C]ourt to take judicial notice of the law of the country of the child's habitual residence without following standard procedures for the proof of foreign law." *Martinez Dona v. Perez Castilblanco*, No. 3:17-cv-02469-L, 2018 WL 928976, at *7 (N.D. Tex. Feb. 16, 2018). Pursuant to Article 14, the Court has taken judicial notice of certain relevant provisions of Honduran law. [*See* ECF No. 54].

provide them in line with the evolution of their physical and mental faculties, the direction and guidance that is appropriate for their development." [*Id*. (translating Honduran Family Code, Art. 191]. Additionally, parental authority includes the right to legally represent the child, "exercise their care and custody," feed, assist, educate, and manage their assets. [*Id*. at App.5 (translating Honduran Family Code, Art. 186; *see also Orellana v. Cartagena*, No. 3:16-cv-00444-CCS, 2017 WL 5586374, at *6 (E.D. Tenn. Nov. 20, 2017)]. Finally, Honduran law provides that, when both parents exercise parental authority, each parent has a *ne exeat* right: a right to consent before the other parent can take the child out of the country. Article 101 of the Honduran Code of Childhood and Adolescence requires that "[i]f parental authority is exercised by both parents, the written authorization of the other is required if just one parent is traveling with the child during [a] trip [outside of Honduras]." [*Id*. (translating Honduran Code of Childhood and Adolescence, Art. 101). The Supreme Court has held that a "*ne exeat* right is a right of custody under the Convention." *Abbott*, 560 U.S. at 10.

It is agreed that Petitioner is the children's father and that no court, Honduran or otherwise, has either granted Respondent full custody of the children or stripped Petitioner of his custody rights. [ECF No. 63 at 2]. It is also agreed that Petitioner did not give written authorization to Respondent's removal of the children from Honduras. In light of these facts and Honduran law, the Court finds that Petitioner had custody rights in the children and that Respondent's removal of the children violated these rights.

### iii. Actual Exercise of Custody Rights

Finally, the Court considers the key point of contention between the parties: whether Petitioner was actually exercising his custody rights at the time of the removal or would have exercised those rights but for the removal. *Larbie*, 690 F.3d at 307. The leading case setting out

the standard under which courts are to consider this element is *Friedrich v. Friedrich*, 78 F.3d 1060 (6th Cir. 1996) ("*Friedrich II*"). The *Freidrich II* court noted that American courts are not well suited to determine the consequences of parental behavior under foreign law, and it recognized the danger that courts might cross into the "forbidden territory" of the merits of the custody dispute itself. *Friedrich II*, 78 F.3d at 1065. Thus, the court held, "[t]he only acceptable solution, in the absence of a ruling from a court in the country of habitual residence, is to liberally find "exercise" whenever a parent with *de jure* custody rights keeps, or seeks to keep, any sort of regular contact with his or her child." *Id*. The *Friedrich II* court continued:

> [I]f a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to "exercise" those custody rights under the Hague Convention *short of acts that constitute clear and unequivocal abandonment of the child*. Once it determines that the parent actually exercised custody rights in any manner, the court should stop—completely avoiding the question whether the parent exercised those rights well or badly. These matters go to the merits of the custody dispute and are, therefore, beyond the subject matter jurisdiction of the federal courts.

*Id*. at 1066 (emphasis added). The Fifth Circuit has adopted the standard articulated in *Friedrich II* and has emphasized that "even occasional contact with [a] child constitutes 'exercise' of [custody] rights." *Sealed Appellant v. Sealed Appellee*, 394 F.3d 338, 345 (5th Cir. 2004).

With the above directive in mind, the Court finds that Petitioner has established that he was actually exercising his custody rights prior to the removal of the children. This determination requires weighing the credibility of the witnesses' testimony regarding Petitioner's contact with the children after Respondent moved out of Petitioner's mother's home. The testimony of the parties was directly conflicting on this point. Petitioner testified that Respondent left his mother's home in mid-to-late 2016 and that he visited the children almost daily thereafter. Respondent testified that she moved out in April 2015 and that Petitioner only saw the children two or three times after this date.

In resolving this disagreement, the Court finds convincing and credible the accounts of the witnesses supporting Petitioner. Ortiz and Avila each testified that Respondent left Petitioner's mother's home much later than April 2015. Both witnesses also testified that they accompanied Petitioner to the home of Respondent's grandparents multiple times, so that Petitioner could visit the children after they no longer lived with him. Ortiz also testified that he saw Petitioner and the children together at a medical clinic after Respondent and the children had moved out. The Court found the testimony Ortiz and Avila, who are not related to Petitioner, to be credible. Further, Euceda testified that she saw Petitioner riding his motorcycle with both children when I.N. was about six months old. The Court also found this testimony credible and it suggests, in direct contrast to the testimony of Respondent, that Petitioner was in contact with his children in mid-2016.

In weighing the testimony, the Court also notes significant inconsistencies in Respondent's version of the relevant events. Respondent initially claimed in her Answer and First Amended Answer, both signed under oath, that Petitioner had never met I.N. and that he had not seen the children "since he abandoned them over three (3) years ago." [ECF No. 25 at 2; ECF No. 29 at 2]. At trial, however, Respondent acknowledged that these statements were not true and that Petitioner had both seen I.N. and seen the children at least two or three times since the date that she allegedly moved out of his mother's home. Respondent also initially testified that the children did not spend the night with Petitioner after she moved out, but she then recounted how Petitioner once took Y.A. without her consent and that Y.A spent the night with Petitioner at that time.

The documentary evidence also supports a conclusion that Petitioner kept some contact with the children after the time that Respondent alleges that he did not. Petitioner provided a photograph showing Petitioner, Respondent, and both children together. Respondent counters that

this was taken during one of the very few instances in which Petitioner saw the children after she left. Petitioner, however, introduced other photographs that show Y.A. standing in front of the distinctly colored walls of Petitioner's mother's home. One such photograph, posted on Respondent's Facebook page one day after Y.A's fourth birthday, which was March 29, 2016, clearly suggests that Petitioner remained in contact with the children—contrary to the testimony of Respondent. Petitioner also offered photographs showing I.N. in front of the same distinctly colored walls of his mother's home, and in a distinctly colored hammock which appeared in photographs of his mother's home. This evidence strongly contradicts Respondent's testimony regarding the extremely limited number of times that Petitioner allegedly saw I.N.

Given the entirety of the evidence, the Court finds that Petition kept at least the required occasional contact with the children that is necessary to find that he was actually exercising his custodial rights. *Sealed Appellant*, 394 F.3d at 345. And the evidence certainly does not suggest that Petitioner took acts that constitute clear and unequivocal abandonment of the children. *Freidrich II*, 78 F.3d at 1066.

Additionally, the evidence suggests that Petitioner was exercising his *ne exeat* right prior to the removal by withholding permission for the children to leave the country. Petitioner testified that, when he learned of Respondent's plans to leave for the United States, he told her that he did not want her to take the children. The credibility of this testimony is bolstered by Petitioner's prompt efforts to secure the return of the children through legal action after the removal. Given this evidence, the Court finds that, prior to the children's removal, Petitioner was also exercising his *ne exeat* right, which is a right of custody under the Hague Convention. *Abbott*, 560 U.S. at 10.

The Court finds that Petitioner has established that he was actually exercising his rights of custody prior to the removal of the children.

### b. Respondent's Defenses

Because Petitioner has made out a *prima facie* case for the children's return, the burden shifts to Respondent to establish one of the Convention's defenses to return. For the reasons stated below, the Court finds that Respondent established no such defense.

### i. "Grave Risk" Defense

Respondent first raises the grave risk defense. Under this defense, return may be excused where there is a "grave risk" that return would "expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." *Lozano*, 572 U.S. at 5. A party opposing a child's return must prove the existence of "grave risk" by clear and convincing evidence. *Madrigal v. Tellez*, 848 F.3d 669, 676 (5th Cir. 2017). The alleged harm "must be a great deal more than minimal" and "greater than would normally be expected on taking a child away from one parent and passing him to another." *Id*. Poverty or living conditions less favorable than what some may consider a minimum standard of living are not grave risks within the meaning of the Hague Convention. *Cuellar v. Joyce*, 596 F.3d 505, 509 (9th Cir. 2010) ("At the time the Convention was adopted, the State Department took care to emphasize that grave risk doesn't 'encompass . . . a home where money is in short supply, or where educational or other opportunities are more limited.'").

Domestic violence can satisfy the defense when the respondent shows by clear and convincing evidence a "sustained pattern of physical abuse and/or a propensity for violent abuse." *Ermini v. Vittori*, 758 F.3d 153, 164 (2d Cir. 2014). Sustained spousal abuse can, in some instances, also create such a risk. *Soto v. Contreras*, 880 F.3d 706, 713 (5th Cir. 2018).

The Court finds that Respondent has not shown by clear and convincing evidence that return to Honduras would expose the children to a grave risk of harm. Respondent testified that Petitioner abused her physically and psychologically. However, Respondent identified only one specific instance in which Petitioner allegedly abused her physically—when Petitioner allegedly pushed her after she confronted him about his involvement with another woman. This unsupported testimony, even if taken as true, does not establish a pattern of sustained spousal abuse by clear and convincing evidence. And Respondent presents no evidence that Petitioner ever abused either of the children. There is not sufficient evidence of any type of abuse that would support finding that the return of the children would expose them to grave risk of harm in this regard. *Whallon v. Lynn*, 230 F.3d 450, 460 (1st Cir. 2000) (finding that mother's allegation that father had verbally abused her and shoved her on one occasion was insufficient to establish a grave risk of harm, particularly where there was no evidence that the father had ever harmed the child).

The additional facts relevant to this defense concern Petitioner's alleged drug use and his practice of taking the children for rides on his motorcycle. Respondent testified that she found cocaine in Petitioner's pocket three times, and that she worried that Y.A. would find the drugs and accidently consume them. Petitioner testified that he has never used drugs. It is also agreed that Petitioner would take both children on rides on his motorcycle. Petitioner's supporting witnesses all testified that, in their opinion, Petitioner was a good father. Euceda, Petitioner's girlfriend, also testified that she trusts Petitioner to be around her 13 and 10-year-old children.

The Court is mindful that it is not to engage in consideration of the underlying custody dispute. *Sealed Appellant*, 394 F.3d at 344. Rather, the Court is tasked only with determining whether Respondent has shown the existence of a harm "greater than would normally be expected on taking a child away from one parent and passing him to another" by clear and convincing

evidence. *Lozano*, 572 U.S. at 5. The conflicting evidence regarding alleged past drug use or rides on a motorcycle does not establish the existence of such a future harm by clear and convincing evidence. Respondent has not met her burden to prove the grave risk defense.

### ii. "Well-Settled" Defense

Under the well-settled defense, a court may decline to return a child where the proceedings have been commenced more than one year after the date of wrongful removal and it is demonstrated that the child is "well settled" in its new environment. *Lozano*, 572 U.S. at 5. It is not disputed that Respondent removed the children from Honduras in November 2017 and that this action was commenced less than one year later, in October 2018. [ECF No. 63 at 2]. Although Respondent initially raised the well-settled defense, she expressly abandoned it at trial and it is clearly not applicable in this case.

## IV. Conclusion

For the reasons stated above, the Court finds that Petitioner has established that Y.A. and I.N. were wrongly removed from Honduras and have been, and continue to be, wrongly retained in the United States. Respondent has not established any defense to return. Therefore, this Court must "order the return of the child[ren] forthwith." *Abbott*, 560 U.S. at 8.

Petitioner's Verified Petition [ECF No. 1] is **GRANTED**. It is **ORDERED** that Y.A. and I.N. be **RETURNED** to Honduras within **30 DAYS OF THE DATE OF THIS ORDER**. The parties are advised that **NO EXTENSIONS OF THIS DEADLINE WILL BE GRANTED**.

It is **ORDERED** that Y.A. and I.N. will not be removed from the Northern District of Texas, Dallas Division, pending their return to Honduras. If Respondent, or anyone acting on her behalf, does remove Y.A. and I.N. from this Court's geographical jurisdiction, other than for the purpose of taking the children directly to Honduras, severe sanctions shall be imposed, including

possible arrest and incarceration for contempt of court. The parties are advised that the Court will direct the United States Marshal Service to take physical custody of Y.A. and I.N., if the Court believes that such action is necessary.

It is **ORDERED** that the parties shall agree as to the method of transporting Y.A. and I.N. to Honduras. Petitioner's counsel has agreed to pay the cost of return for the children and Respondent, if she desires to return with the children, and Petitioner's counsel shall do so.

Finally, it is **ORDERED** that the parties shall file, within ten days of the date of this Order or two days prior to the children's planned return, whichever is earlier, a joint report informing the Court of the exact method and timing of the children's planned transportation to Honduras. As soon as possible, and not later than three days after Y.A. and I.N.'s return to Honduras, the parties will file a notice with the Court informing the Court that that the children have been safely returned to Honduras.

The Court will retain jurisdiction over this matter until Y.A. and I.N. are returned to Honduras.

**SO ORDERED**.

May 29, 2019.

_____
BARBARA M.G. LYNN
CHIEF JUDGE